Hubert H. Kuo (SBN 204036)
    hkuo@ardentlawgroup.com
Jennifer C. Berschauer (SBN. 203977)
    jberschauer@ardentlawgroup.com
ARDENT LAW GROUP, P.C.
4340 Von Karman Ave., Suite 290
Newport Beach, CA 92660
Tel: (949) 299-0188
Fax: (949) 299-0127

Attorneys for Defendants/Counterclaimants ARTIST
INTERNATIONAL CO., LTD., and ERAS
SPORTING CO., LTD., Defendants LI-WEI HOU,
and LI-MING HSU

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADDADAY, INC., a Delaware corporation, and VICTOR YANG, an individual<br><br>Plaintiffs,<br><br>v.<br><br>ARTIST INTERNATIONAL CO., LTD., a foreign corporation, ERAS SPORTING CO., LTD., a foreign corporation, SUZHOU AIDISITE TRADING CO., LTD., a foreign corporation, LI-MING HSU, an individual, LI-WEI HOU, an individual, HUNG-WEN CHEN, an individual, and DOES 1 through 10, inclusive,<br><br>Defendants.<br><br>AND ALL RELATED COUNTER-CLAIMS | Case No. 2:21-cv-05525-AB (PLAx)<br>Assigned for all purposes to:<br>Hon. Judge Andre Birotte Jr.<br>Courtroom 7B<br><br>**DECLARATION OF YI-BI LIN IN SUPPORT OF REPLY TO OPPOSITION TO APPLICATION FOR RIGHT TO ATTACH ORDER AND AN ORDER FOR ISSUANCE OF A WRIT OF ATTACHMENT**<br><br>**Hearing:**<br><br>**Date: May 11, 2022**<br><br>**Time: 10:00 a.m.**<br><br>**Courtroom 780**<br><br>**Judge: Hon. Paul L. Abrams** |

I, Yi-Bi Lin, declare:

     **1.**     I am a shareholder and director of Eras Sporting Co., Ltd. ("Eras"), a Taiwanese corporation.  I am the sole shareholder of Artist International Co., Ltd. ("Artist") and Artist's director and chief executive officer.

2. I make this declaration in support of Defendant and Counterclaimants' Artist and Eras's Reply to Opposition to Application for Right to Attach Order and Order for Issuance of a Writ of Attachment. I have personal knowledge of the facts set forth in this Declaration, and if called to testify under oath, could and would testify competently thereto.

**Addaday Authorized Use of the Addaday Mark**

3. As set forth below, neither Eras nor Artist improperly used or stole any trademarks belonging to Plaintiffs and Counterdefendants, Addaday, Inc. ("Addaday") or Victor Yang ("Yang").

4. Addaday specifically authorized Eras and Artist to use the Addaday mark. Eras and Artist used the mark only in accordance with the authorizations, the terms of which are set forth below.

5. Specifically, on April 18, 2019, Addaday authorized Artist's China affiliate, Suzhou Artist Fitness Trading Co., Ltd., to use the "addaday" trademark in the Asian region. The "Brand Authorization Letter," signed by Victor Yang on behalf of Addaday and dated April 18, 2019, provides that Addaday LLC is the legal holder of the trademark addaday and the associated logo. The Brand Authorization Letter specifically authorizes Artist's affiliate to use the trademark 'addaday' in the Asian region. A true and correct copy of the Brand Authorization Letter is attached hereto as **Exhibit A**.

6. On April 18, 2019, Victor Yang, of Addaday, sent an email to two separate email addresses at Eras, including sales@eras.com.tw and ssj@eras.com.tw. Yang attached to his April 18, 2019 email, the Brand Authorization Letter, signed by Mr. Yang. A true and correct copy of Yang's April 18, 2019 email, to which he attached the signed Brand Authorization Letter, is attached hereto as **Exhibit B**.

7. In addition, on or about September 16, 2019, Addaday signed the Certification of Authorization of Eras Sporting Co., Ltd. The Certification of

2

Authorization of Eras Sporting Co., Ltd. specifically authorized Eras Sporting Co., Ltd. to manufacture, distribute, and sell the co-branded Addady/IRONMAN BioChair massage chairs (the "Merchandise"), to include Addaday's 'IRONMAN ®' and the 'M-DOT' logo trademark, on Eras merchandise and/or packaging, marketing materials, product labels or tags, and to sell merchandise within the United States. A true and correct copy of the Certification of Authorization of Eras Sporting Co., Ltd., is attached hereto as **Exhibit C**.

8.      Artist and Eras acted at all times within the parameters of the Brand Authorization Letter and Certification of Authorization of Eras Sporting Co., Ltd. Neither Artist nor Eras purloined Addaday's trademarks, nor did Artist or Eras sell counterfeit goods as they were specifically authorized to procure and distribute Addaday's goods.

**Allegedly Defective Products and Agreed to Procedure**

9.      While Addaday contends Artist and Eras shipped defective products, Addaday has failed to provide any evidence to confirm its claim that it received defective product. Moreover, Addaday failed to adhere to the specific terms of the Performa Invoice agreements in situations in which claimed to have received allegedly defective products.

10.      The parties, including Addaday, on one hand, and Artist, on the other, regularly document their agreements for Addaday's purchase of product by way of Performa Invoices, also known as Sales Confirmations. All Performa Invoice agreements between Addaday and Artist include specific provisions for situations in which Addaday claims it received defective product.

11.      Specifically, the Performa Invoice agreements between Addaday, on one hand, and Artist, on the other, which were regularly used by the parties, always included this provision:

> "If there are any quality problems, the Buyer should bring forward the complaint within 30 days after receiving cargo

3

and offer specific description on quality defects and evidences such as pictures. Otherwise it will be regarded that the Buyer gives up his quality opposition rights."

A true and correct copy of a sample Performa Invoice agreement, also known as a Sales Confirmation, regularly exchanged between Addaday and Artist, is attached hereto as **Exhibit D**.

12.	Despite the terms of the Performa Invoice agreements, Addaday did not at any time notify Artist and Eras, in accordance with the notice requirement in the Performa Invoice agreements, that it had received any allegedly defective product. The evidence Addaday could have submitted to demonstrate defects included, among other things, documentation from the retailers, return merchandise authorizations (RMA), or end user complaints. While Addaday submitted a summary of returns, a summary of returns is not evidence of defects and is insufficient.  For example, consumers could return a product for various reasons other than being defective, such as buyer's remorse, dislike of product, price, etc. Neither Artist nor Eras's recovery should be offset with returns.  When Addaday purchased the products, and those goods were delivered to Addaday, title to the goods transferred to Addaday, thus the risk of consumer returns is on Addaday, not the supplier.

13.	With respect to the alleged defective massage guns, Addaday sent only two samples of allegedly defective products to Artist. One of the two samples of allegedly defective products provided by Addaday to Artist worked and showed no sign of defect. As to the other sample provided to Artist by Addaday, Eras replaced the product.  In fact, even though Addaday failed to comply with the inspection/reporting of defective products protocol pursuant to the Performa Invoices, Eras replaced and even sent replacement products to Addaday at Eras' own costs.

4

**14.**     In light of the foregoing failure to comply with the terms of the Performa Invoices and specifically the failure to provide notice within thirty days along with evidence and a specific description of the defect, Addaday is not entitled to an offset for allegedly defective products.

### Addaday Is Not Entitled to Offset for Defective Product

**15.**     The Performa Invoice agreements also make clear that Addaday is not entitled to an offset for defective product. If there is a dispute on a batch of products in one invoice, until it is resolved, Addaday cannot use that as an excuse to offset the amount for other invoices. The Performa Invoice agreements provide:

> "When there is a quality dispute on certain batch of products, both parties agree that handling of these products will not affect dealing of other batches of products. The Buyer cannot countervail, without the Seller's permission, the payment of products which may have quality problem with payment of other batches."

### Positive Reviews of Allegedly Defective Products

**16.**     Moreover, the online review systems for various sellers of the products reflect overall highly positive reviews for the products. For instance, Addaday's own website shows product reviews it received for the BioZoom Edge. Addaday's online summaries for the 'BioZoom Edge', one of the products Addaday now claims was defective and for which it seeks an offset, reflect positively on the BioEdge Zoom. Addaday's own website shows the 'BioZoom Edge' received an average of four and one-half (4.5) out of five (5) stars. Of the ninety-six product reviews, seventy-seven percent (77%) of the BioZoom Edge customer reviews gave it five stars. A true and correct copy of Addaday's webpage with review information for the BioZoom Edge is attached hereto as **Exhibit E**.

**17.**     The Target website similarly shows positive reviews for the BioZoom Edge. Target's website reveals reviewing product users gave the BioZoom Edge an average of four (4) out of five (5) stars, with sixty-seven percent (67%) of reviewers

giving the product five (5) stars. A true and correct copy of Target's online page with review information for the BioZoom Edge is attached hereto as **Exhibit F**.

18. The REI website also reflects favorable reviews for the BioZoom Edge. REI's website shows the BioZoom Edge received an average of four (4) out of five (5) stars for the product, fifteen (15) of the reviews gave the product five (5) stars, and there are a total of twenty-three (23) reviews for the product. A true and correct copy of REI's website page which includes the product review information is attached hereto as **Exhibit G**.

19. All of these stores, Addaday, Target, and REI, continue to sell the BioZoom Edge product.

### Exclusive Procurement and Distribution Rights

20. The Common Stock Purchase Agreement, dated October 1, 2019, entered into by and between Addaday, Inc., on one hand, and Eras Sporting Co., Ltd., on the other hand, granted exclusive procurement and distribution rights to Eras. Sections 4.7 and 4.8 of the Common Stock Purchase Agreement provide:

4.7 **Exclusive Procurement.** Company[1] shall designate the Stockholder as an exclusive party who procures products with no territory restrictions.

4.8 **Exclusive Distributor in Taiwan & China.** Company shall designate the Stockholder as the exclusive distributor for all Company's products in Taiwan & China.

22. Despite these specific terms of the Common Stock Purchase Agreement, specifically according to which Eras had exclusive rights to procure products for Addaday and then distribute all of Addaday's products in Taiwan and China, Addaday circumvented Eras and found another supplier for Addaday. Addaday did this surreptitiously and did not notify Eras or its affiliates that it found

---

[1] The Common Stock Purchase Agreement identifies Addaday, Inc. as Company and Eras Sporting Co., Ltd. as the "Stockholder."

another supplier.  As a result, when Eras first became aware of the products, Eras reported the incident to the authorities in China, which seized those goods.  A true and correct of the Common Stock Purchase Agreement is attached hereto as **Exhibit H.**

I declare under penalty of perjury under the laws of the state of California and the United States that the foregoing is true and correct.

Executed this  9th  day of May 2022 in the city of   Suzhou  , China.

By: _____
Yi-Bi Lin

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  A

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND
WRIT OF ATTACHMENT



Addaday LLC
2500 Broadway, Building F, 125
Santa Monica, CA 90404

# Brand Authorization Letter

Authorizer: Addaday LLC

Authorized party: Suzhou Artist Fitness Trading CO.,LTD

Addaday LLC is the legal holder of the trademark "addaday" ✦addaday. Addaday LLC solely authorizes Suzhou Artist Fitness Trading CO.,LTD to use trademark "addaday" in the Asian region. Without the authorization of Addaday LLC, no company or manufacturer could use trademark "addaday" for promoting products, advertising, selling, proceeding after sales service, etc.

Authorizer: Addaday LLC

Sign & Stamp

Date:

4 / 18 / 19

Authorized party: Suzhou Artist Fitness Trading CO.,LTD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  B

9

**From:**            vic@addaday.com
**Sent:**            Thursday, April 18, 2019 1:16 AM
**To:**              sales@eras.com.tw; ssj@eras.com.tw
**Subject:**         authorization letter
**Attachments:**     authorization letter.pdf


Signed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  C

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT



**September 16, 2019**

Re: CERTIFICATION OF AUTHORIZATION OF ERAS SPORTING CO.,LTD

**To Whom It May Concern:**

This letter is being provided to you by ADDADAY INTELLIGENT TECHNOLOGIES.LLC, a California corporation ("**ADDADAY**"), and serves to certify that ADDADAY has authorized ERAS SPORTING CO.,LTD ("**ERAS**") to:

1.  Manufacture, distribute, and sell the co-branded Addady|IRONMAN BioChair massage chairs (the "**Merchandise**")

2.  Include of feature the "IRONMAN®" and the "M-DOT" logo trademark on such Merchandise and/or their packaging, marketing materials, product labels or tags; and

3.  Sell Merchandise within the United States.

This certification is effective until December 31, 2020, unless earlier revoked in writing by ADDADAY. If you have any questions regarding the foregoing, you may contact via email at addaday@addaday.com.

Signature

Victor Yang

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  D

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT

**ARTIST INT'L CO., LTD.**
60 Market Square, P.O. Box 364, Belize City, Belize
Tel: 886-2-2507-7872; Fax: 886-2-2507-702(

## Sales Confirmation

**Updated ON 10/23!**

| To: Addaday Inc. 2500 Broadway F125, Santa Monica, CA90404, USA | Date: | 10/Jul/20 |
|---|---|---|
| | PI# | 20ADD#C15 |
| | Tel: | 310-905-2737 |
| | Fax: | |

SHIPMENT: See shipping schedule.
SHIP FROM: Ningbo      China
TO: Los Angeles      USA
PAYMENT: T/T 90 DAYS

| Item No. | DESCRIPTION | Product Picture | QUANTITY | US$/UNIT | AMOUNT |
|---|---|---|---|---|---|
| | | | PCS | FOB | US$ |
| 1 | MS2955-30      BIOZOOM PLUS Brushless Motor,  20-level speed 1200RPM-3100RPM/ 20HZ~52HZ Stroke: 9mm Battery life [1500mA]: 1~3hours Stall force: 22lbs | * Add 1pc individually brown box: +usd0.5/set * Change package to case+color sleeve: +usd4.3/set * Add 1pc AppTag: +usd0.2/pc | 5000 | US$62.00 | US$310,000.00 |
| Packing: | 1 set/Case+Color Sleeve/brown box; 4sets/CTN | | | | |
| 2 | Tooling cost for BioZoom Plus | | 1 | US$50,000.00 | US$50,000.00 |
| 3 | MS2959-01      BIOZOOM JR. Brushless Motor,  3-level speed 1200/2400/3200RPM Stroke: 6mm Battery life [2000mA]: 1~3hours Stop force: 5KG Length: 153mm      Add 1pc blue massage head | | 250 | US$45.99 | US$11,497.50 |
| Packing: | 1 set/WHITE GIFT BOX + Color Sleeve + Shrink film; 10sets/CTN | | | | |

**Shipping Schedule:**

| Shipments | Quantity | Ship Date |
|---|---|---|
| one shipment | 250 | 2020/8/17 if all required Artworks can be provided before 7/22! |

| TOTAL: | | | 5250 | PCS | US$371,497.50 |
|---|---|---|---|---|---|

SAY TOTAL: U.S. DOLLARS THREE HUNDRED AND SEVENTY ONE THOUSAND FOUR HUNDRED AND NINTY SEVEN AND CENTS FIFTY ONLY.

**Remarks: If the total amount per shipment is less than US$ 6,000, handling charge US$200 is needed!**

*If there are any quality problems, the Buyer should bring forward the complaint within 30 days after receiving cargo and offer specific description on quality defects and evidences such as pictures. Otherwise it will be regarded that the Buyer gives up his quality opposition rights.

*When there is quality dispute on certain batch of products, both parties agree that handling of these products will not affect dealing of other batches of products. The Buyer cannot countervail, without the Seller's permission, the payment of products which may have quality problem with payment of other batches.

All disputes in connection with this contract or the execution thereof shall be settled by negotiation between two parties. If no settlement can be reached, the case in dispute shall then be submitted for arbitration in US. The decision made by the arbitration organization shall be taken as final and binding upon both parties. The arbitration expenses shall be borne by the losing party unless otherwise awarded by the arbitration organization.

**\*\*\* SHIPPING MARK \*\*\***          Please advise!!!

Accepted & Confirmed by
Addaday Inc.

Victor Yang



ARTIST INT'L CO., LTD.
For and on behalf of
ARTIST INT'L CO., LTD.

Authorized Signature
Fax: 0086-512-8278-5361

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  E

12



SHOP NOW     ADDADAY APP     ABOUT US





       

# Edge

Trusted by Olympic and World Champion athletes, the award-winning Bluetooth®-enabled BioZoom™ Edge cordless percussion massager is one of the quietest devices on the market and when connected to the free companion Addaday App, it will do the thinking for you.

Help





**SHOP NOW**     **ADDADAY APP**     **ABOUT US**

Add accident protection offered by **Extend**   What's covered?

| 1 Year - $14.99 | 2 Year - $24.99 | 3 Year - $32.99 |

−  1  +     ADD TO CART

**When used correctly it can help:**

- ✦ Decrease both muscle soreness and pain
- ✦ Increase blood flow and circulation
- ✦ Accelerate warm-up and recovery
- ✦ Increase range of motion

ABOUT THE PRODUCT

# Details & Features

## Overview

The BioZoom Edge features Bluetooth technology that enables it to connect to the optional Addaday app, which guides you through tailored therapies to treat pain, mitigate injuries, prime the body for exercise and recovery, as well as aide in relaxation. The Addaday app does the thinking for you, learning the more you use it. It's like having an expert with you 24/7/365.

## Features

## As Seen In

**LEARN ABOUT "PERCUSSION POWER"** →

**COMPARE ADDADAY TO THE COMPETITION** →

Help



SHOP NOW   ADDADAY APP   ABOUT US





GET INSPIRED

# Our Athletes



## Matt McElroy

ITU Triathlon World Cup medalist

Help



SHOP NOW   ADDADAY APP   ABOUT US



CUSTOMER THOUGHTS

# Product Reviews

**4.5**

96 reviews

WRITE A REVIEW

**74%**

of respondents would recommend this to a friend

| | |
|---|---|
| 5 Stars | 77 |
| 4 Stars | 6 |
| 3 Stars | 1 |
| 2 Stars | 5 |
| 1 Star | 7 |

## Reviewed by 96 customers

Enter Search Terms

### Good product, great support


5

I had a biozoom for a couple of years and loved it. It's ability to speed up recovery and keep me nimble through agressive training was unrivaled. When it broke last month I was quite sad but after getting in touch with the support team they sent me a new one. That is good service. Very impressed and good product.

**Bottom Line** Yes, I would recommend to a friend

**Submitted** 25 days ago
**By** Jack
**From** new hampshire

**Was this review helpful to you?**  👍 0   👎 0   Flag this review

### Noisy after only a few uses.

2

I received my edge as a gift. I've only used it a few times and now it makes a rattling noise all of the time. I googled and it says there's a screw inside that needs tightening but I can't even figure out how to open it up to tighten the screw. I can't even get the battery off. I don't know where it was purchased because it was a gift so I don't know if I even have a warranty. I'm very disappointed.

**Submitted** 1 month ago
**By** Ricky
**From** Highlands Ranch, CO

**Bottom Line** No, I would not recommend to a friend

**Was this review helpful to you?**  👍 0   👎 0   Flag this review

### I wouldn't buy this again


2

Help

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  F

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT

 Search     

Target / Sports & Outdoors / Exercise & Fitness / Workout Recovery

Shop all Addaday

## Addaday BioZoom Edge Percussion Massager - Gray

In stock at Irvine University Town Center



Addaday Biozoom Edge Percussion Massager - Gray : Target

☰    Search    Ⓞ    🛒



★★★★☆ 53 ⌄    2 Questions

| Pickup | Delivery | Shipping |
|---|---|---|
| Ready within 2 hours | As soon as 8pm today | Get it by Thu, May 12 |

**Pick up at**

**Irvine University Town Center**

Check other stores

Ready within 2 hours for pickup inside the store

Only 2 left

Qty  1  ⌄         Add to cart

☐  **Allstate 2 Year Electronics Protection Plan**
$10.99 · See plan details

🎁 Create or manage registry      Sign in

🟥 **Save 5% every day**              >
With RedCard

🌈 **4 payments as low as $24.99**      ⓘ
Interest-free with Sezzle

Learn more from Addaday

# About this item

**Details**    Shipping & Returns    Q&A (2)

Chat with a Beauty Consultant

# Guest Ratings & Reviews

**4.0**

53 star ratings



**42% would recommend**

14 recommendations

| | |
|---|---|
| 5 stars | 68% |
| 4 stars | 4% |
| 3 stars | 8% |
| 2 stars | 4% |
| 1 star | 17% |

 **Value** out of 5 — 3.3

 **Quality** out of 5 — 3.3

## Review images

 

Write a review

## Reviews related to

Style    Features    Application    Sounds    Warranty    Material    Battery

Length    Warning

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  G

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT



Shop REI    REI Outlet    Used Gear    REI Adventures    Classes & Events    Expert Advice    Uncommon Path    Co

. . .  /  Injury Prevention and Recovery  /  Massagers

[Addaday](#)

# Addaday BioZoom Massager

**4.0**  |  23 Reviews                                                                    Item #167570



Grey/blue



This product is not available.

Shop similar products

Sure, your adventure was epic—but that doesn't mean the second-day soreness has to be. The Addaday BioZoom cordless massager helps with myofascial release and blood flow for an even faster recovery.

**Features**                                                                              ⌄

**Technical Specs**                                                                       ⌄

**Reviews**        (23)                                                                    ⌃

Write a review

Rating Snapshot
Select a row below to filter reviews.



5 ★        15
4 ★        2
3 ★        1
2 ★        2
1 ★        3

Average Customer Ratings

Overall    ★★★★★        4.0

1–12 of 23 Reviews                                        Sort by: Most Recent ▾

**couchsloth**          ★★★★★ · a year ago

North Carolina          **game changer**

Reviews **8**           Don't buy a sketchy one, spend the bit more for a good
                        brand name. These things are a game changer, especially

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT  H

DECLARATION IN SUPPORT OF APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT

## COMMON STOCK PURCHASE AGREEMENT

This Common Stock Purchase Agreement (this "**Agreement**") is made as of October 1, 2019 ("**Effective Date**"), by and among Addaday, Inc., a Delaware corporation (the "**Company**"), and Eras Sporting Co., Ltd., a Taiwan corporation ("**Stockholder**").

The parties agree as follows:

**1.        Purchase and Sale of Common Stock.**

       **1.1.        Sale and Issuance of Common Stock.**

           **(a)**        The Company has filed or shall adopt and file with the Secretary of State of the State of Delaware on or before the Closing (as defined below) the Certificate of Incorporation in the form of **Attachment B** attached to this Agreement (the "**Certificate**").

           **(b)**        Subject to the terms and conditions of this Agreement, each Stockholder agrees to purchase at the Closing and the Company agrees to sell and issue to each Stockholder at the Closing that number of shares of Common Stock (the **"Common Stock"**), set forth opposite each Stockholder's name on **Attachment A**, which is incorporated by reference with this Agreement, for 300,000 shares of Common Stock at $0.60 per share, for an aggregate payment of Five Hundred Thousand Dollars ($500,000.00) (the "**Purchase Price**").   The shares of Common Stock issued to the Stockholders pursuant to this Agreement (including any shares issued at the Closing) shall be referred to in this Agreement as the "**Shares**."

       **1.2.        Closing; Delivery.**

           **(a)**        The initial purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 5 p.m. Pacific Daylight Time, on December 31, 2019, or at such other time and place as the Company and the Stockholders mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**").   In the event there is more than one closing, the term "**Closing**" shall apply to each such closing unless otherwise specified.

           **(b)**        At each Closing, the Company shall deliver to each Stockholder a certificate representing the Shares being purchased by such Stockholder at the Closing against payment of the purchase price therefor by check payable to the Company, by wire transfer to a bank account designated by the Company, by cancellation or conversion of indebtedness of the Company to Stockholder, or by any combination of such methods.

           **(c)**        The Company agrees and acknowledges that Stockholder has paid Two Hundred Thousand Dollars ($200,000) of the aggregate Purchase Price on November 7, 2019.  Stockholder will pay the remainder Three Hundred Thousand Dollars ($300,000) to the Company on or before the Initial Closing.

       **1.3.        Defined Terms Used in this Agreement.**  In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

           **(a)**        "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person.

           **(b)**        "**Code**" means the Internal Revenue Code of 1986, as amended.

           **(c)**        "**Key Employee**" means Victor Yang.

           **(d)**        "**Knowledge,**" including the phrase "**to the Company's knowledge,**" shall mean the actual knowledge of Victor Yang.

    **(e)** "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Company.

    **(f)** "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

    **(g)** "**Stockholder**" means each of the Stockholders who is initially a party to this Agreement and any Additional Stockholder who becomes a party to this Agreement at a subsequent Closing hereunder.

    **(h)** "**Stockholders Agreement**" means the agreement among the Company, the Stockholders and certain other stockholders of the Company, dated as of the date of the Closing, in the form of **Attachment C** attached to this Agreement.

    **(i)** "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

    **(j)** "**Transaction Agreements**" means this Agreement and the Stockholders Agreement.

   **2.** **Representations and Warranties of the Company.** Except as specifically set forth on the Schedule of Exceptions attached hereto as **Attachment D** (the "**Schedule of Exceptions**"), the Company hereby represents and warrants to each Stockholder that the following representations are true and complete as of the date of the Closing.

    **2.1.** **Organization, Good Standing, Corporate Power and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as presently conducted and as proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect. The Company has all requisite power and authority to execute and deliver the Transaction Agreements, to sell and issue the Shares, and to carry out and perform its obligations under the terms of each of the Transaction Agreements.

    **2.2.** **Capitalization.**

    **(a)** The authorized capital of the Company consists, immediately prior to the Closing, of: 5,000,000 shares of common stock (the "**Common Stock**"), 700,000 shares of which are issued and outstanding immediately prior to the Closing; and 5,000,000 shares of preferred stock, none of which have been issued or are outstanding. All of the outstanding shares of Common Stock have been duly authorized, are fully paid and nonassessable.

    **(b)** **Attachment E** sets forth the capitalization of the Company immediately following the Closing (assuming full investment of 300,000 Shares pursuant to this Agreement).

    **2.3.** **Subsidiaries.** The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

    **2.4.** **Authorization.** All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into the Transaction Agreements and to issue the Shares at the Closing, has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of the Transaction Agreements, the performance of all obligations of the Company under the Transaction Agreements to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. The Transaction Agreements, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, (ii) as

limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, or (iii) to the extent the indemnification provisions may be limited by applicable laws.

**2.5.     Valid Issuance of Shares.**   The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Transaction Agreements, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Stockholder.  Assuming the accuracy of the representations of the Stockholders in **Section 3** of this Agreement and subject to the filings described in **Subsection 2.6** below, if any, the Shares will be issued in compliance with all applicable federal and state securities laws.

**2.6.     Governmental Consents and Filings.**   Assuming the accuracy of the representations made by the Stockholders in **Section 3** of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Certificate, which will have been filed as of the Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect.  The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

**2.7.     Litigation.**   There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company; (ii) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company).  There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate.

**2.8.     Employee Matters.**

**(a)**     To the Company's knowledge, none of its employees or consultants is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's or consultant's ability to promote the interest of the Company or that would conflict with the Company's business.  Neither the execution or delivery of the Transaction Agreements, nor the carrying on of the Company's business by the employees and consultants of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee or consultant is now obligated.

**(b)**     The Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants, or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification, and collective bargaining.  The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing.

**(c)**     To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee, nor does the Company have a present intention to terminate the employment of any of the foregoing.  The employment of each employee of the Company is terminable at the will of the Company.

**2.9.    Compliance with Other Instruments**.    Neither the execution, delivery or performance of the Transaction Agreements by the Company nor the compliance with its obligations hereunder or thereunder, nor the consummation of the transactions contemplated hereby or thereby, nor the issuance, sale or delivery of the Shares will:

        **(a)**    violate any provision of the Certificate or Bylaws of the Company;

        **(b)**    violate in any material respect any federal, state or local statute, law, rule or regulation or any judgment, decree, order, regulation or rule of any federal, state or local governmental authority (collectively, "**Applicable Laws**") or any Permit;

        **(c)**    permit or cause the acceleration of the maturity of any obligation of the Company; or

        **(d)**    violate or be in conflict with, constitute a default under, permit the termination of, require the consent of any party under or result in the creation or imposition of any lien upon any property of the Company under, any mortgage, indenture, loan agreement, note or any other agreement to which the Company is a party or by which the Company (or any of its properties) may be bound (collectively, "**Applicable Agreements**").

**2.10.    Taxes**.    There are no federal, state, county, local or foreign taxes dues and payable by the Company which have not been timely paid.  There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed.  There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency.  The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

**2.11.    Compliance with Laws**.    The Company has complied with and is not in violation of any Applicable Law, in any such case, the violation of which could, singly or in the aggregate, have a Material Adverse Effect.

**2.12.    Offering**.    The Company has not, either directly or through any agent, offered any securities to or solicited any offers to acquire any securities from, or otherwise approached, negotiated or communicated in respect of any securities with, any Person in such a manner as to require the offer or sale of the Securities to be registered pursuant to the provisions of Section 5 of the Securities Act or the securities laws of any state.  Neither the Company nor anyone acting on its behalf will take any action that would cause any such registration to be required (including, without limitation, any offer, issuance or sale of any security of the Company under circumstances that might require the integration of such security with Shares under the Securities Act) which might subject the offering, issuance or sale of the Shares to the registration provisions of the Securities Act.  Assuming the truth and accuracy of the Stockholders' representations and warranties in Section 3 hereof, the issuance of the Shares is exempt from registration under the Securities Act.  The Company has complied with all federal and state securities and blue sky laws in all issuances and purchases of its capital stock prior to the date hereof and has not violated any Applicable Law in making such issuances and purchases of its capital stock prior to the date hereof.  Any notices required to be filed under federal and state securities and blue sky laws shall be filed on a timely basis.

**2.13.    Agreements; Actions**.

        **(a)**    Except for the Transaction Agreements, there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company is a party or by which it is bound that may involve (i) obligations (contingent or otherwise) of, or payments to the Company in excess of $25,000, or (ii) the license of any patent, copyright, trade secret or other proprietary right to or from the Company, or (iii) provisions restricting or affecting the development, manufacture or distribution of the Company's products or services, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

        **(b)**    The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $25,000 in the

aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of subsections (b) and (c) of this **Subsection 2.13**, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

        **2.14.**    **Tangible Assets and Equipment**. The Company owns outright or leases, pursuant to enforceable lease agreements, all of its tangible assets and equipment used in its business. The Company has good and marketable title to all such assets and equipment that are not leased, free and clear of any liens or encumbrances.

        **2.15.**    **Investment of Funds**. The existing stockholder of 700,000 shares of common stocks of the Company, Addaday Intelligent Technologies, LLC ("**AIT LLC**"), will loan five hundred thousand dollars ($500,000.00) to the Company ("**Funds**"), interest free, on or before June 30, 2021 ("**Funds Deadline**"), provided that if the revenue of the Company does not reach to twenty million dollars ($20,000,000) by December 31, 2020, the Funds will become capital and Company no longer needs to repay such Funds to AIT LLC. AIT LLC and Stockholder agree to execute a mutual agreement regarding the Funds. If AIT LLC fails to provide the Funds by the Funds Deadline, AIT LLC's shares on the Funds Deadline shall be reduced, calculating by the following formula: the actual funds provided on the Funds Deadline by AIT LLC, divided by $0.714 per share. AIT LLC and Company will execute another agreement regarding such loan with the Stockholder.

        **2.16.**    **Bylaws.** The Bylaws of the Company shall be amended by the mutual agreement of the Stockholder and AIT LLC.

        **3.**    **Representations and Warranties of the Stockholders.** Each Stockholder hereby represents and warrants to the Company, severally and not jointly, that:

        **3.1.**    **Authorization.** The Stockholder has full power and authority to enter into the Transaction Agreements. The Transaction Agreements to which the Stockholder is a party, when executed and delivered by the Stockholder, will constitute valid and legally binding obligations of the Stockholder, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

        **3.2.**    **Purchase Entirely for Own Account.** This Agreement is made with the Stockholder in reliance upon the Stockholder's representation to the Company, which by the Stockholder's execution of this Agreement, the Stockholder hereby confirms, that the Shares to be acquired by the Stockholder will be acquired for investment for the Stockholder's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Stockholder has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Stockholder further represents that the Stockholder does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Stockholder has not been formed for the specific purpose of acquiring the Shares.

        **3.3.**    **Disclosure of Information.** The Stockholder has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in **Section 2** of this Agreement or the right of the Stockholders to rely thereon.

        **3.4.**    **Restricted Securities.** The Stockholder understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Stockholder's representations as expressed herein. The Stockholder understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Stockholder must hold the Shares indefinitely unless they are registered with the

Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  The Stockholder acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale except as set forth in the Investors' Rights Agreement.  The Stockholder further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Stockholder's control, and which the Company is under no obligation and may not be able to satisfy.  The Stockholder understands that this offering is not intended to be part of any public offering, and that the Stockholder will not be able to rely on the protection of Section 11 of the Securities Act.

        **3.5.**    **No Public Market.**  The Stockholder understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

        **3.6.**    **Legends.**  The Stockholder understands that the Shares and any securities issued in respect of or exchange for the Shares, may bear one or all of the following legends:

        **(a)**    "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.  SUCH SHARES ARE SUBJECT TO A RIGHT OF FIRST REFUSAL AS SET FORTH IN THE CORPORATION'S BYLAWS."

        **(b)**    Any legend set forth in, or required by, the other Transaction Agreements.

        **(c)**    Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate so legended.

        **3.7.**    **Accredited Investor.**  The Stockholder is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

        **3.8.**    **Financial Status**.  The Stockholder, either alone or with Stockholder's professional advisors who are unaffiliated with, have no equity interest in and are not compensated by the Company or any affiliate or selling agent of the Company, directly or indirectly, has such knowledge and experience in financial and business matters that Stockholder is capable of evaluating the merits and risks of an investment in the Shares and has the capacity to protect Stockholder's own interests in connection with Stockholder's proposed investment in the Shares.

        **3.9.**    **No General Solicitation.**  Neither the Stockholder, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

        **4.**    **Conditions to the Stockholders' Obligations at Closing.**  The obligations of each Stockholder to purchase Shares at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

        **4.1.**    **Representations and Warranties.**  The representations and warranties of the Company contained in **Section 2** shall be true and correct in all respects as of the Closing.

        **4.2.**    **Performance.**  The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Closing.

        **4.3.**    **Qualifications.**  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

**4.4.  Certificate.**  The Company shall have filed the Certificate with the Secretary of State of Delaware on or prior to the Closing, which shall continue to be in full force and effect as of the Closing.

**4.5.  Stockholders Agreement.**  The Company and each Stockholder shall have executed and delivered the Stockholders Agreement.

**4.6.  No Actions or Proceedings**.  No action, suit or proceeding by or before any court, agency or other governmental body shall have been asserted, instituted or threatened by any party to restrain, prohibit or invalidate the transactions contemplated by this Agreement.

**4.7.  Exclusive Procurement**. Company shall designate the Stockholder as an exclusive party who procures products with no territory restrictions.

**4.8.  Exclusive Distributor in Taiwan & China**. Company shall designate the Stockholder as the exclusive distributor for all Company's products in Taiwan & China.

**5.  Conditions of the Company's Obligations at Closing.**  The obligations of the Company to sell Shares to the Stockholders at the Closing are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

**5.1.  Representations and Warranties.**  The representations and warranties of each Stockholder contained in **Section 3** shall be true and correct in all respects as of the Closing.

**5.2.  Performance.**  The Stockholders shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before the Closing.

**5.3.  Qualifications.**  All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Closing.

**5.4.  Stockholders Agreement.**  Each Stockholder shall have executed and delivered the Stockholders Agreement.

**6.  Covenants.**

**6.1.  Expenses.**  Each party shall be responsible for their own costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby.

**6.2.  Further Assurances**.  The Company will cure promptly any defects in the creation and issuance of the Shares, and in the execution and delivery of the Agreements.  The Company, at its expense, will execute and deliver promptly to each Stockholder upon request all such other and further documents, agreements and instruments in compliance with or pursuant to its covenants and agreements herein, and will make any recordings, file any notices and obtain any consents as may be necessary or appropriate in connection therewith.

**6.3.  Securities Filings**.  The Company will file on a timely basis all notices of sale required to be filed with the Securities and Exchange Commission pursuant to Regulation D under the Securities Act and under applicable state securities laws with respect to the transactions contemplated by this Agreement.

**7.  Miscellaneous.**

**7.1.  Survival of Warranties.**  Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Stockholders contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement.

**7.2.  Successors and Assigns.**  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their

respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.3.     Governing Law.**  This Agreement shall be governed by the internal law of the State of California without regard to conflict of laws principles.

**7.4.     Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**7.5.     Titles and Subtitles.**  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**7.6.     Notices.**  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or:  (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at their address as set forth on **Attachment A** hereto, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this **Subsection 7.6**.  If notice is given to the Company, a copy shall also be sent to Hakim Law Group, 11812 San Vicente Blvd., Suite 380, Los Angeles, California 90049, Attn: Afshin Hakim.

**7.7.     No Finder's Fees.**  Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.  Each Stockholder agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which each Stockholder or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Stockholder from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**7.8.     Attorneys' Fees.**  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**7.9.     Amendments and Waivers.**  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and (i) the holders of at least 100% of the then-outstanding Shares or (ii) for an amendment, termination or waiver effected prior to the Closing, Stockholders obligated to purchase 100% of the Shares to be issued at the Closing.  Any amendment or waiver effected in accordance with this **Subsection 7.9** shall be binding upon the Stockholders and each transferee of the Shares, each future holder of all such securities, and the Company.

**7.10.    Severability.**  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

**7.11.    Delays or Omissions.**  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the

extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

**7.12.     Entire Agreement.**  This Agreement (including the Exhibits hereto), the Certificate, and the other Transaction Agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

**7.13.     Dispute Resolution.**  The parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the state courts of the State of California located in Los Angeles County and of the United States District Court for the Central District of California located in Los Angeles County for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of State of California located in Los Angeles County or the United States District Court for the Central District of California located in Los Angeles County, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL:  EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS.  EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

[Signature page follows.]

IN WITNESS WHEREOF, the parties have executed this Common Stock Purchase Agreement as of the date first written above.

"**Company**"

Addaday, Inc.,
a Delaware corporation

By:   _____
      Victor Yang
      President

"**Stockholders**"

See Stockholders' Signature Page to Common Stock Purchase Agreement attached hereto.

**ATTACHMENT A**

STOCKHOLDERS' SIGNATURE PAGE TO
COMMON STOCK PURCHASE AGREEMENT

SIGNATURE FOR INDIVIDUALS ONLY

Signature: _____          Signature: _____

Print Name: _____          Print Name: _____

Address: _____          Address: _____

_____          _____

Telephone: _____          Telephone: _____

Email: _____          Email: _____

SIGNATURE FOR ENTITIES AND TRUSTS ONLY

Print Name of Entity or Trust:   **Eras Sporting Co., Ltd.**

Signature:   _Hsu Li Ming_

Print Name:   ___Jason Hsu___

Title:   ___General Manager___

Address:   _9F., No. 31, Ln. 37, Sec. 3, Zhongshan Rd., Zhonghe Dist.,_
_New Taipei City 235, Taiwan (R.O.C.)_

Telephone:  _+886-2-25077872____

Email:   _eras@eras.com.tw___

TOTAL AMOUNT OF INVESTMENT:   **$500,000.00**.

NUMBER OF SHARES OF COMMON STOCK BEING PURCHASED:   **300,000**.

**ATTACHMENT B**

**ATTACHMENT C**

**ATTACHMENT D**

**SCHEDULE OF EXCEPTIONS**

Reference is made to that certain Common Stock Purchase Agreement by and among Addaday, Inc. and the stockholders listed on **Attachment A** thereto dated November 26, 2019 (the "**Agreement**").  By this reference, this Schedule of Exceptions is incorporated into the Agreement.   Disclosures made under the heading of one section of this Schedule of Exceptions shall apply to and/or qualify disclosures made under one or more other sections only to the extent it is reasonably apparent from the content and context of such disclosure that it applies to such other section or sections.  Section headings are provided for convenience only.  Unless otherwise defined, any capitalized terms in this Schedule of Exceptions shall have the same meanings assigned to such terms in the Agreement.

Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant.  Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission of any liability or obligation of the Company to any third party, nor an admission against the Company's interests.  This Schedule of Exceptions includes brief descriptions or summaries of certain agreements and instruments, copies of which have been made available to Stockholder.  Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described.

**ATTACHMENT E**

| Post-Financing Capitalization | | | |
|---|---|---|---|
| | **Common** | **Shares Outstanding** | **Fully- Diluted Outstanding %** |
| Addaday Intelligent Technologies, LLC | 700,000 | 700,000 | 70.00% |
| Eras Sporting Co., Ltd. | 300,000 | 300,000 | 30.00% |
| | | | |
| **Total** | **1,000,000** | **1,000,000** | **100.00%** |

1

## <u>CERTIFICATION OF SERVICE</u>

2      The under signed attorney certifies that copies of the foregoing

3    **DECLARATION OF YI-BI LIN IN SUPPORT OF REPLY TO**

4    **OPPOSITION TO APPLICATION FOR RIGHT TO ATTACH ORDER**

5    **AND AN ORDER FOR ISSUANCE OF A WRIT OF ATTACHMENT** was

6    served upon all parties who have appeared on May 9, 2022.

7
                                    /s/ Hubert Kuo
8                                   Hubert H. Kuo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16